### Case No. 4,941.

### FORMAN v. PEASLEE.

[21 Law Rep. 273.]

Circuit Court, D. New Hampshire. May Term, 1857.

Choate & Griswold, for plaintiff.
Mr. Hallett, Dist. Atty., contra.

CURTIS, Circuit Justice. This is an action against the collector of the port of Boston and Charlestown, to recover back moneys paid under protest for duties on an importation of railroad iron, manufactured by the plaintiff in England, and exported by him to this country, to be sold here on his account. It appears that the plaintiff made a contract with Train & Co., who had a line of packet ships plying between Liverpool and Boston, to transport this iron from Wales, where it was manufactured, to Boston, at a freight of twenty-two shillings and sixpence per ton. Train & Co. employed coasting vessels to take it on board at the ports of Newport and Cardiff, in Wales, and bring it to Liverpool, where it was laden on board their packet ships and brought to Boston. In appraising the iron, the appraisers fixed its market value at the time of its departure from Liverpool. The plaintiff insisted it should be at the time of his departure from Newport and Cardiff; and protest-

ed for this cause against the payment of the duties exacted by the collector. The act of March 3, 1851, § 1 (9 Stat. 629), requires the appraisers to ascertain the market value of the import, "at the period of the exportation to the United States." The natural meaning of the words "period of exportation," is termination of exportation. The period of exportation is that point of time when the act of exportation is complete. The subject matter of the statute is the appraisal of goods exported from a foreign country and imported into the United States. So that the inquiry in this case is, at what point of time was the act of exportation of this merchandise from the foreign country, England, complete? My opinion is, when it left Liverpool. Its transportation coastwise from one English port to another was not an exportation from England. Until the vessels of Train & Co. having it on board were cleared and sailed from Liverpool, there was no completed act of exportation. Until that time the property was under the control of the British government, whose order could have arrested and detained it within that country, and whose control over it would have been unaffected by the fact that it had been brought from Cardiff and Newport for the purpose of being sent to the United States.

The plaintiff's counsel relied on the case of Barrett v. Stockton & B. Ry. Co., reported in 2 Man. & G. 134, and on error in 3 Man. & G. 956, and 11 Clark & F. 590. But that case tends to support the construction which I place on the act of congress. It is true it was decided in all the courts that under the act of parliament then in question, exportation might mean simply carrying out of a port; and as between the public and a corporation claiming a toll, and upon the special provisions of that act, it was held it did mean so. But it was admitted that its more usual sense was a more restricted sense, and covered only cases where property was not merely sent out of one port to another of the same kingdom, but carried to a foreign country. And that such is the meaning of the word "exportation" in this act of congress can admit of no doubt, for it can have no reference to transportation from one port to another of the same country; its language and its object and its subject matter all confine the exportation here spoken of to an exportation from some foreign country to the United States.

But it is further argued that the merchandise left Wales for the United States, and under a bill of lading which showed that it was to come hither. The bill of lading, if it can be considered as but one, which I doubt, and the intent of the party in sending the property from Wales, cannot make the act of exportation from Great Britain complete on leaving Wales, when it was not so in fact.

It is further insisted that this case is like Gant v. Peaslee [supra]. But this is not so. Goods, the produce of Turkey, were exported from that country to the United States. On their way hither they were carried to England, and without being landed were transshipped. I held they were not imported into the United States from England. Their going to England and being transshipped there affected only the route and means of their transit after the act of exportation from Turkey had been completed. But here the fact that this merchandise went to Liverpool and was there transshipped, affected the mode and time of transit out of Great Britain, and prevented that from being complete until the merchandise left Liverpool.

The next objection is that the collector added to the charges six shillings sterling per ton for the cost of transporting the property from Wales to Liverpool. I am of opinion this was illegal. There was no such charge in fact. The plaintiff agreed with Train & Co. on a certain rate of freight from Wales to the United States. It does not appear that he paid any more freight because Train & Co., instead of sending their ships to Newport and Cardiff, chose to bring the iron in other vessels to Liverpool. It appears that the market price of railroad iron is always quoted, and was so taken by these appraisers, at so much per ton "free on board in Wales." So that from the nature of the trade no charges which precede the shipment are to be added to the market price. They are included in that price, and are borne by the seller. That marine freight, whether an import be brought direct from the country of exportation or via other ports and places, is not a dutiable charge, has been repeatedly held. Gant v. Peaslee [supra]; Millar v. Millar [Case No. 9,546].

The next objection involves a question of much importance, and which is attended with no little difficulty. It is, whether these goods, having been procured otherwise than by purchase, were rightly appraised by pursuing the course marked out by the 17th section of the tariff act of 1842 (5 Stat. 564), as amended by the act of March 3, 1851 (9 Stat. 629), or whether it was necessary to conform to the act of March 1, 1823 (3 Stat. 729). This question affects—First, the point of time at which the value should be ascertained; second, the persons by whom the appraisement should be made; third, the consequence of the appraisement as respects the additional duty by way of penalty.

As to the first of these, it is insisted by the plaintiff, that as these goods were procured otherwise than by purchase, their actual value at the time and place when procured, and not their market value at the period of their exportation, should have been ascertained, pursuant to the fifth section of the act of 1823 (3 Stat. 732). Independent of the first section of the act of March 3, 1851

(9 Stat. 629), this position would probably have been held to be correct. But the language of that section is, "in all cases in which there is or shall be imposed any ad valorem rate of duty, &c., it shall be the duty of the collector, &c., to cause the actual market value or wholesale price thereof at the period of the exportation to the United States, in the principal markets of the country from which the same shall have been imported into the United States, to be appraised, estimated, and ascertained." This language is broad enough to cover cases of imports procured otherwise than by purchase. It expressly embraces all cases of imports subject to an ad valorem rate of duty. And when it is added that this law is known to have been passed to change certain rules decided by the supreme court in Greely v. Thompson, 10 How. [51 U. S.] 225, and that that was a case of goods not purchased, there can be no doubt that congress intended to embrace such cases and change the rule of the act of 1823, and bring them all under one uniform rule as to the time in reference to which the value should be fixed.

The second particular, viz., the persons by whom the appraisal is to be made, is attended with more difficulty. The sixteenth section of the act of 1823 required the president to appoint two appraisers for each port therein mentioned; and the eighteenth section provides for a reappraisement by two merchants chosen by the importer, together with the two government appraisers; and also, a further appeal to the secretary of the treasury. The 17th section of the act of 1842 (5 Stat. 564) points out the mode of proceeding by the government appraisers, confers on them certain special powers to enable them efficiently to discharge their duties, and gives an appeal to two merchants, to be chosen by the collector. This was the mode followed in the present case; and it is insisted that it was illegal, because this section applies only to the appraisement of goods purchased. It is said that in Greely v. Thompson [supra] the supreme court so viewed this section, and that this court followed this view in Barnard v. Morton [Case No. 1,005]. I think this is so. But in neither of these cases was this point necessarily involved in the decision, nor does the question whether the seventeenth section of the act of 1842 is restricted to cases of imports procured by purchase, appear to have been examined and carefully considered. Still, I should follow what is said in Greely v. Thompson [supra] if I did not think the subsequent legislation, in the act of 1851, had a most material bearing on the question. I proceed, therefore, to examine it. There can be no doubt that the sixteenth section of the act of 1842 applies only to goods purchased. It may be admitted, also, that the mode and means of appraisement provided for in the seventeenth section, had reference more immediately and prominently to the cases embraced in the sixteenth section. But the question is whether they extend to no other cases. The language is broad enough to include all cases of merchandise requiring an appraisal. "It shall be lawful for the appraisers, &c., to call before them and examine upon oath or affirmation any owner, importer, consignee, or other person, touching any matter or thing which they may deem material in ascertaining the true market value or wholesale price of any merchandise imported," &c. The subject of the appraisement is any merchandise imported. The purpose of the appraisement is to ascertain the actual market value; and by the act of 1823 (section 5) the actual value, which means the same thing, was to be ascertained. The mischief to be remedied was the same. No reason is perceived why it was not as necessary to give the appraisers these new powers in reference to importations of goods manufactured or produced, as well as goods purchased by the importer. Indeed, where there was an actual purchase, there would seem to be less danger of undervaluation than where no actual transaction had occurred to fix the market value of the particular goods. Upon mature reflection I should feel great difficulty in holding that this new and more efficient mode of appraisal, which in terms is extended to any merchandise imported, was designed to include only goods purchased. And the act of March 3, 1851, passed after the decision of Greely v. Thompson [supra] tends strongly, in my judgment, to show that the seventeenth section of the act of 1842 must now be construed to include all cases of appraisement. It has already been stated that the first section of that act extends to and includes goods procured otherwise than by purchase. The second section also applies to all cases of appraisement, and makes the certificate of one appraiser sufficient. The third section provides for the appointment of general appraisers, who are to visit such ports as may be designated by the secretary of the treasury, to give aid and assistance so as to secure uniformity in the collection of the revenue; and it proceeds: "And wherever practicable, in cases of appeal from the decision of United States appraisers under the provisions of the seventeenth section of the act of 1842, the collector shall select one discreet and experienced merchant to be associated with one of the appraisers to be appointed under this act, who together shall appraise the goods in question; and if they shall disagree, the collector shall decide between them; and the appraisement thus determined shall be final, and deemed and taken to be the true value of the said goods, and the duties shall be levied thereon accordingly, any act of congress to the contrary notwithstanding." Now it is, to say the least, highly improbable that congress would by the first and second sections of this act embrace all cases of importations calling for

an appraisement, and change the rules as to the time of valuation and the number of appraisers required in all, and yet, when they came to these new and important provisions to secure uniformity of valuation, leave out of their operation all cases where goods were procured otherwise than by purchase. And yet they have done so if the seventeenth section of the act of 1842 does not include those cases. For they extend the new provisions only to appeals which are claimed under that seventeenth section. In my judgment this has a very strong tendency to show that the seventeenth section was intended to embrace, and does embrace, all cases of appraisements of goods, however the same may have been procured. And as these acts are in pari materia, and each is to be construed by the aid of all the light which can be obtained from all the rest, I shall hold, until otherwise instructed by the supreme court, that the seventeenth section of the act of 1842 points out the mode and the consequences of an appraisement of goods procured otherwise than by purchase. And this determines the remaining question, whether any penalty was incurred when it was found that the appraised value exceeded the invoice value ten per centum. As the seventeenth section of the act of 1842, in my opinion, applies to the case, and as the penalty fixed by that section was the one exacted, there was no error, save that the penalty was assessed on the charges; it was, in that particular, not warranted by law. The result is, that the plaintiff is entitled to recover back the six shillings per ton added to the valuation as a charge, and such part of the penalty as was assessed on the charges. For this, when computed, a verdict will be entered, as was agreed by the parties.