GEORGE R. SAMPSON AND LEWIS W. TAPPAN, DOING BUSINESS UNDER THE STYLE AND FIRM OF SAMPSON & TAPPAN, PLAINTIFFS IN ERROR, *v.* CHARLES H. PEASLEE, COLLECTOR OF CUSTOMS.

By the eighth section of the act of Congress passed on the 30th of July, 1846, (9 Stat. at L., 42, 43,) it is declared that if the appraised value of imports which have actually been purchased shall exceed by ten per centum or more the value declared on the entry, then, in addition to the duties imposed by law on the same, there shall be levied, collected, and paid, a duty of twenty per centum *ad valorem* on such appraised value.

The true construction of this section is, that the additional duty of twenty per centum is to be levied only upon the appraised value, and not upon charges and commissions added to it.

The day of the sailing of a vessel from a foreign port is the true period of exportation of goods. The Secretary of the Treasury so directed it to be done, as he had a right to do by law; and this court concurs with him in this, as being a correct exposition of the statute.

Where an importation was alleged to be an unit, but divided into two invoices for the sake of convenience, and entered of different values, each invoice must stand upon its own footing; and the whole cannot be averaged, so as to avoid the additional duty which is levied upon one invoice taken by itself.

Where an examination made by the merchant appraiser was such as is usually made in buying and selling hemp in bales, and was satisfactory to the merchant appraiser, it was not open to the importer to show that he adopted a mode of examination insufficient to detect fraudulent packing or diversities in the qualities of the different parts of the importation.

THIS case was brought up, by writ of error, from the Circuit Court of the United States for the district of Massachusetts.

The facts are stated in the opinion of the court.

It was argued by *Mr. Griswold* and *Mr. Reverdy Johnson* for the plaintiffs in error, and by *Mr. Black* (Attorney General) for the defendant.

Mr. Justice WAYNE delivered the opinion of the court.

This case has been brought to this court by a writ of error from the Circuit Court of the United States for the district of Massachusetts.

It is an action for money had and received. It was sued out by the plaintiffs against the defendant, the collector of customs

for the port of Boston, to recover the sum of $14,206.10, with the interest thereon, which the plaintiffs allege was illegally exacted from them by the defendant in his official character, and which was paid by them under protest, as the law permits that to be done.

The aggregate amount sued for is made by several items:

First, $1,624.25, being an amount of duty exacted on an importation of Manilla hemp, over and more than the duty on the value declared on *the entry of it*. Second, the sum of $12,067.60, for an additional duty of twenty per cent., exacted under the eighth section of the tariff act of 1846, on *the appraised value* of one of the invoices of the hemp; and the sum of $524.25 on another invoice of hemp, which the plaintiffs allege to be a portion of the same importation.

The plaintiffs recovered in the Circuit Court the sum of $1,022.75 damages and costs of suit, but being dissatisfied therewith, and with the rulings of the court, have brought this writ of error.

The plaintiffs were engaged in trade with China, Manilla, and the East Indies. They wrote to their agents in Manilla, in March, 1854, to purchase, and ship by the ship Telegraph, four thousand bales of Manilla hemp. The agent bought the hemp, and began to ship it on board of the Telegraph, from lighters, on the 23d of June, 1854, the ship then being in the roadstead, three or four miles from the shore. Each lighter received a permit from the custom-house to be laden and to leave for the ship. The export duty to which the hemp was liable became due and payable as each lighter was laden, and before it could leave for the vessel. But when it is known that the shippers are in good credit, the export duty is allowed to remain unpaid until the whole cargo has been shipped. In this instance, the whole cargo had been shipped by the 29th June. On the 30th it was all on board of the ship and under deck, and a bill of lading was signed for two thousand five hundred and twenty bales of it. On the 1st July, a bill of lading was signed for the residue of the cargo. On the 1st July, the hatches of the ship were caulked down by noonday, and in the afternoon the ship was cleared at the custom-house and ready for sea, but not having the wind, did not sail; nor did she sail on the 2d July, the master of the ship having objected to do so on the Sabbath. On Monday, the 3d, the ship went to sea.

The cargo was bought with Brown Brothers & Co.'s credit, and paid for by bills on London. It is a common practice at Manilla, when the shipment is large, to make of the whole two or more invoices, it being difficult to negotiate a bill for a whole cargo when it is of a large amount, as they frequently are, and

as this cargo was, the hemp alone having cost over $80,000. When the cargo is divided into different invoices for the purpose of negotiating the bills by which it has been bought, the invoices for the separate parts are sent with a bill of lading with the bills intended to be negotiated.

The Telegraph's cargo amounted to more than $95,000. In conformity with the practice, and for the purpose just mentioned, it was separated into two invoices. One of them contained two thousand five hundred and twenty bales of hemp, and other merchandise, amounting to $58,772.69; it was dated June 30th, with bill of lading of the same date. The other invoice was for fifteen hundred and twenty-eight bales, and a quantity of loose hemp, amounting to $36,367.03; it was dated June 30th, with bill of lading dated July 1.

On Sunday, July 2d, the day that the captain of the Telegraph refused to sail, the overland mail from England arrived at Manilla; it brought news of the war with Russia. The consequence was, an immediate and material advance in the market price of hemp the next day, July 3d, that being the day when the Telegraph went to sea.

Upon the arrival of the Telegraph at Boston, the plaintiff entered her cargo; a part for consumption, and the residue on bond, *each invoice being separately entered* at the custom-house. It was appraised by the United States appraisers at $11 per picul, excepting eighty bales of red hemp and two hundred and eighteen and sixty-two hundredths loose piculs, which were appraised at $10.50 per picul. The collector, by the directions of the Secretary of the Treasury, informed the merchant appraiser and the general appraiser that the cargo was to be appraised with reference to what was its value at Manilla on the day that the ship sailed, that day being the period of its exportation to the United States. The act under which that direction was given is, "That in all cases where there is or shall be imposed any *ad valorem* rate of duty on any goods, wares, or merchandise, imported into the United States, it shall be the duty of the collector, within whose district the same shall be imported or entered, to cause the actual market value or wholesale price thereof *at the period of the exportation to the United States*, in the principal markets of the country from which the same shall have been imported into the United States, *to be appraised, estimated, and ascertained;* and to such value or price shall be added all costs and charges, except insurance, and including in every case a charge for commissions at the usual rates, as *the true value at the port* where the same may be entered, upon which duties shall be assessed."

It also appears that the appraiser's valuation of the hemp

*exceeded by ten per centum the value declared on the entry of the 2,520 bales,* but it did not exceed by ten per centum the value declared on the entry of the 1,528 bales. Nor did it exceed by ten per centum the value of the aggregate of the two invoices, constituting, as the plaintiffs claimed, the importation of 4,000 bales. An additional duty of 20 per centum was assessed on the appraised value of the 2,520 bales, *also on the charges and commissions.*

Manilla hemp comes in bales about twenty inches square by three feet in length, pressed hard together, is covered with matting, and is bound closely with ratan bands at short distances apart.

The examination of the hemp for appraisement was made in this wise. Slits were cut in the matting, which covered the bales that were examined, so that different parts of the outside surface of the hemp could be seen, but the ratan bands holding the bales together were not cut. It is said, had they been cut, the appraisers could have examined the inside of the bales. The difficulty of binding the bales together again is the reason given by the appraisers for not cutting the ratan bands. Though slits were cut in the matting, the principal part of it was not removed; the slits disclosed only small parts of the surface of the bales, and no attempt was made to open the hemp for the purpose of ascertaining its quality beneath the exterior. In fact, no more than the surface was seen. However, *the merchant appraiser testifies that the examination was such as is usual in buying or selling hemp in bales.*

Upon this statement of the case, the plaintiffs' counsel contended that the appraisement was illegal and invalid, and insufficient to negative or displace the value declared on the entry, because the appraisers did not exercise any judgment or discretion in *regard to the period of the exportation of the hemp to the United States,* but merely obeyed the instructions of the Secretary of the Treasury, to take the date of the sailing of the vessel as the rule to guide them. And the court was asked to instruct the jury accordingly. The court refused to do so, but did instruct them, that if the period so prescribed by the Secretary was the true period of exportation, the objection was untenable; *and did further instruct the jury, that the date of the sailing of the vessel from the foreign port for her destination in the United States was the true period of exportation.* The plaintiffs excepted to this ruling.

The plaintiffs' counsel then moved the court to instruct the jury, that, upon the facts proved, all the hemp imported was to be taken to be one entire entry at the custom-house, for the purpose of declaring and appraising the value for the levy of duties.

The court refused, and did rule and instruct the jury, *"that each entry was to be deemed as a separate transaction for the purpose of appraisement and the assessment of duties thereon."* To this ruling the plaintiffs excepted.

Then the plaintiffs offered to prove that hemp was of various qualities and values. That it was impossible to determine the qualities of all the packages by such an examination as was testified to by the merchant appraiser. That, for the last three years or more, much of the Manilla hemp imported has been *"muzzled"* in the bale, and that it was impossible to tell whether it was so or not, without cutting the bands and removing all of the matting, opening the bale, and examining the inside of it. That the outside of the bale sometimes appears to be and is of good and current quality, while the inside of it may be filled with refuse or inferior. That it is often so tangled or *"muzzled,"* as to render the bale from ten to twenty per centum less valuable than if it were all of the same quality as the outside of the bale. That, besides being *muzzled,* there are usually three or more grades in the same bale, differing in value from one to three cents per pound. That, in order to determine the proportion of each, which makes up a bale, it is necessary to see and compare its contents in the inside of it with the rest. That it is the custom of the trade to make an allowance of from one to three cents per pound on all *muzzled* or inferior hemp found on opening the bale after purchase. But it was admitted that the examination made of the Telegraph's cargo, by the appraisers, was such as is usually made on buying or selling hemp. Upon this the court ruled, *that if the examination made by the merchant appraiser was that usually made in buying or selling hemp, and had been satisfactory to the merchant appraiser, it was not open to the plaintiffs to show that he adopted a mode of examination, for the levy of duties, insufficient to detect fraudulent packing or diversities in the qualities of the different parts of a bale of hemp.* To this ruling and instructions the plaintiffs also excepted.

One other ruling of the court was given upon the prayer of the plaintiffs, to which the *defendant excepted.* It was this: that so much of the additional duty of 20 per centum as was levied upon the *charges and commissions,* and paid by the plaintiffs under protest, was unauthorized by law. This ruling of the court is a correct interpretation of the eighth section of the act of July 30th, 1846, 9 Stat. at L., 42, 43. It declares, if the *appraised value* of imports which have actually been purchased shall exceed by ten per centum or more the *value declared on the entry,* then, in addition to the duties imposed by law on the same, there shall be levied, collected, and paid, a duty

of twenty per centum *ad valorem* on such *appraised value.* In other words, the twenty per centum *ad valorem* is to be on the appraised value only, without being assessed upon the charges and commissions.

We now proceed to the other points in the case to which the plaintiffs excepted to the rulings of the court.

The first in order is, that the appraisement of the hemp was illegal and invalid, and insufficient to displace the value declared on the entry, because the appraisers were instructed to appraise and estimate the value of the hemp as of the 3d day of July, the day of the sailing of the vessel; whereas they should have estimated and appraised it *at the period of actual shipment,* or *date* of *bill of lading.* The point is stated as it was made by the counsel of the plaintiffs in his argument of the case in this court. But whilst it comprehends one subject of the prayer of the plaintiffs and the gist of the court's instruction, it omits a part of the first, which we do not think it immaterial to notice, to prevent in future the proposition which it involves, as to the independence of the appraisers of the customs, from being made again. The court was asked to instruct the jury, that the appraisement in this instance was invalid and illegal, for the reason that the appraisers did not exercise their judgment and discretion in regard to the period of exportation, but that they obeyed the instructions of the Secretary of the Treasury, to take the date of the sailing of the vessel as the rule to guide them. The court refused to give the instructiion as it was asked, but did instruct the jury, that if the period so prescribed by the Secretary was the true period of exportation, the objection was untenable, and that the date of the sailing of the vessel from the foreign port for her destination in the United States was *the true period of exportation.* We concur in the correctness of the instruction. Besides its having been made the duty of the Secretary of the Treasury from time to time to establish rules and regulations, not inconsistent with the laws of the United States, to secure a faithful appraisal of all goods and merchandise imported into the United States, the collectors and other officers of the customs are directed to execute the Secretary's instructions relative to the revenue laws; and his decision is declared to be binding and conclusive upon all of them, whenever a difficulty shall arise as to the true construction of those laws. (Sections 23, 24, Stat. at Large, 563.)

The court's ruling, also, that the date of the sailing of the vessel was the true period of exportation, is correct. The Secretary's interpretation of the act of the 3d March, 1851, is in conformity with the letter and spirit of it, and cannot be

controlled by different interpretations and instructions which may have been given by his predecessors to the words, "at the period of the exportation to the United States." Though, as we have read the circulars of the Secretaries of the Treasury in respect to those words in the revenue act, as to the time when duties shall be assessed upon the value of imports, we do not perceive any difference in them, which may not be readily accounted for by the different acts to which the instruction or direction to the collector was meant to be applied. The same remark may be made of the decisions made by this court, whenever it has been necessary for it to determine at what date duties should be assessed upon imported merchandise, subject to an *ad valorem* rate of duty.

Nor have we been able to bring ourselves to the conclusion—ingeniously put, and ably urged by the plaintiffs' counsel here—that Congress, in passing the tariff act of March 3, 1851, meant to use the words "period of exportation" in the sense in which they had been understood by the Treasury Department in its construction of previous revenue acts, and as that construction may have been sanctioned by this court. There had been uncertainties of opinion and in practice in the Treasury Department, and also in several ports of the United States, in respect to the time when the dutiable value of imported goods should be estimated. Some of the collectors made the estimate *at the date of the purchase*, whenever that may have been. Other collectors made their estimate at the date of the shipment. Mr. Secretary Walker, in his circular of July 6, 1847, meaning to establish a uniform rule, states the varying practice, and directs the valuation to be made "at the date of the shipment." He says it is the true construction of the law, long since declared by the Department, and adopted generally throughout the Union. He adds, that the proviso of the 16th section of the act of August 30, 1842, is clear and emphatic upon the subject, and prescribes the date, with reference to which the value is to be estimated, as the *period of exportation to the United States*. But Mr. Secretary Meredith, three years afterwards, in his circular of the 5th July, 1850, eight months before the act of the 3d March, 1851, was passed, observes, that the appraisers had been restrained in the discharge of their duties by the result of frequent appeals from their decisions. And in order to secure a just, faithful, and impartial appraisal of all goods, wares, and merchandise, imported into the United States, he declares—

1. That the period of the exportation of merchandise is the time at which the value of any article is to be fixed by the appraisers.

2. That in ordinary cases *the date of the bill of lading* may be regarded as the "period of exportation."

This court decided, in the cases Greely *v.* Howard, 10 How., 225, and in Maxwell *v.* Griswold, 10 How., 242, in the year 1850, before the act of the 3d March, 1851, had passed, that under the sixteenth and seventeenth sections of the tariff act of 30th August, 1842, 5 Stat. at L., 563, the value of merchan dise *at the time of procurement* is to be ascertained, not its value *at the time of exportation.* Congress, with these differences in view, and particularly in consequence of the decision of this court in the cases just before cited, passed the act of March 3d, 1851. This court in 1855, in Stairs et al. *v.* Peaslee, 18th Howard, 521, 524, 525, in considering the act, uses this lan guage, which is decisive of the time when the value of goods subject to an *ad valorem* duty is to be estimated: "The lan guage of this act of Congress is general, and embraces all im portations of goods that are subject to an *ad valorem* duty, and directs that their value shall be estimated and ascertained by the wholesale price at the period of exportation to the United States in the principal markets of the country from which they are imported. The time and the place to which the appraisers are required to look when making their appraisement are both distinctly specified in the law, the time being *the period of ex portation,* and the place the country from which they were imported into the United States. It makes no reference to their value in the country of production or the time of pur chase. And as there is no ambiguity in the language of the act, and it embraces all goods subject to an *ad valorem* duty, the court would hardly be justified in giving a construction to it narrower than its words fairly import." Though this ex tract was written with reference to the first point certified in that case, which was, whether the act of the 3d March, 1851, repealed so much of all former laws as provided that merchan dise, when imported from a country other than that of produc tion or manufacture, should be appraised at the market value of similar articles at the principal markets of the country of production and manufacture "at the period of the exportation to the United States," the court adds, that the law, taken by itself, will admit of but one construction; and that is, the ap praisement must be made by the value of the goods in the principal markets of the country from which they are exported, at *the time of such exportation to the United States.*"

The case of Stairs *v.* Peaslee, considered in connection with what this court had decided under the revenue acts in Greely *v.* Howard, and in Maxwell *v.* Griswold, 10 How., 242, shows, whatever may have been the practice in computing the time

for the assessment of duties, that this court viewed the act of the 3d March, 1851, as having fixed the rule to be the time or date of the exportation, as that might be shown by the day of the vessel's sailing from the foreign port to the United States. Indeed, from the phraseology of the act, without reference to preceding acts upon the same subject, or what had been their construction, the same conclusion must be reached.

The word *period* has its etymological meaning, but it also has a distinctive signification according to the subject with which it may be used in connection. It may mean any portion of complete time, from a thousand years, or less, to *the period of a day;* and when used to designate an act to be done, or to be begun, though its completion may take an uncertain time, as, for instance, the act of exportation, it must mean the day on which the exportation commences, or it would be an unmeaning and useless word in its connection in the statute.

The ruling of the court upon the first prayer of the plaintiffs is not subject to the exception taken.

We proceed to the second exception taken by the counsel of the plaintiffs to the ruling of the court upon their prayer. It was, that the court would instruct the jury, upon the facts proved, that all the hemp imported by the plaintiffs was to be taken to be one entire entry, for the purpose of declaring and appraising the value for the levy of duties.

No facts in the case were proved, upon which such an instruction could have been given. The proof is, that the plaintiffs were purchasers in Manilla of four thousand bales of hemp, which were put by them into two invoices for their own convenience; one containing two thousand five hundred and twenty bales, the other one thousand five hundred and twenty, and a quantity of loose hemp; the first valued at $58,772.69, the second at $36,367.03, for each of which a separate bill of lading was taken. The plaintiffs entered them separately at the custom-house, and they were separately appraised without *any objection at the time from the defendant.* But it turned out, upon the appraisement, that the appraised value of the first exceeded by ten per centum the value of it declared upon the entry, which made it liable, under the eighth section of the act of the 30th July, 1846, to the additional duty of twenty per centum *ad valorem* on the appraised value. But the appraisement of the second invoice of one thousand five hundred and twenty-eight bales did not exceed by ten per centum the value declared on the entry of it; nor did the appraised value of the two invoices, constituting the importation of four thousand bales, exceed by ten per centum the aggregate of their separate values declared in the entries of them.

Now, the plaintiffs seek to be released from the twenty per cent. additional upon the appraised value of the first invoice, because the second invoice was not subject to it, and because the aggregate of the values of both, as declared upon the entries of them, were not exceeded by ten per cent. upon the appraisement.

Upon such a state of facts, the court rightly instructed the jury, that each invoice and entry was to be deemed and treated as a separate transaction for appraisement, and for the assessment of duties.

An importer of merchandise is bound by the law to make his entry at the custom-house according to his invoice, either by himself, the consignee, or their agent, and not otherwise than by invoice verified by oath, unless it shall be done conditionally, either under the tenth section of the act of March 1st, 1823, or under the second section of the same act, permitting entries to be made of imported merchandise, subject to *ad valorem* duties upon appraisement without invoice. (3 Stat. at L., 729.)

When an entry has been made, it is conclusive upon the importer as to the contents, and declared value of the invoice; and for all of those consequences which the law may impose upon the examination and appraisement of it, and for any deficiency or non-compliance with the revenue laws regulating the entries of imported merchandise, or for any violation or substantial departure from directions which may have been given by the Secretary of the Treasury for the entry and appraisement of foreign goods, and for the collection of duties upon the same. See general regulations under United States revenue laws, by Mr. Secretary Guthrie, of February 1, 1857.

As to the third exception taken by the plaintiffs to the rulings of the court, we think it was right in telling the jury, that if the examination of the hemp made by the merchant appraiser was such as is usually made in buying and selling the article, and was satisfactory to the merchant appraiser, it was not open to the plaintiffs to show that he adopted a mode of examination insufficient to detect fraudulent packing or diversities in the qualities of the different parts of the bales of hemp.

The importance of this case in respect to the collection of the revenue under the act of the 3d March, 1851, and under the regulations of the Secretary of the Treasury upon it, have induced us to give to the different points in the case our mature consideration, and we are of the opinion that the judgment of the Circuit Court should be affirmed.

It is ordered accordingly, and that the appellants shall pay the costs which have been incurred in the prosecution of their writ of error.

Mr. Justice GRIER dissented.