GIBB (GRIFFIN v.). See Case No. 5,819.

## Case No. 5,380.
### GIBB v. WASHINGTON.
[1 McAll. 430.] [1]

Circuit Court, N. D. California. July Term, 1858.

CUSTOMS DUTIES—EXAMINATION BY APPRAISERS—SELECTION OF SAMPLES — OFFICIAL REPORTS — COSTS OF TRANSPORTATION TO PLACE OF EXPORT.

1. An examination of goods by the appraisers is indispensable.

2. Personal examination of each article not necessary. A fair selection of samples sufficient.

3. The official report of the appraisers, is prima facie evidence as to examination. Appraiser under the acts of congress is a quasi judge. His acts, as such, are not purely ministerial. If such an office has been colorably created, and one commissioned under it who has discharged de facto its duties, his acts so far as the public or third parties are concerned, are as valid as those of one acting de jure would be.

4. The additional charges authorized by law, to be added to the appraised value of dutiable merchandise, may be added by the appraisers, with the sanction of the collector.

5. Costs of transportation of goods from the interior to the place of exportation, are not included in those charges under the act of 3d March, 1851 [9 Stat. 629].

[Cited in Hutton v. Schell. Case No. 6,961; Tomes v. Redfield. Id. 14,085; Bartels v. Redfield, 16 Fed. 340.]

The present action is brought for the recovery of moneys alleged to have been illegally received by the defendant as collector of the port of San Francisco, and paid by the plaintiff, under protest. A jury was waived by the parties, and the case submitted to the court on the law and facts for its judgment.

Cyril V. Grey, for plaintiff.
P. Della Torre, for defendant.

McALLISTER, Circuit Judge. To sanction the defense, establish the illegality of the proceedings, and that the appraisement of

1 [Reported by Cutler McAllister, Esq.]

the goods, on which the duties were levied, is void, plaintiff's counsel have presented the following grounds: 1st. That there should have been a personal examination of the goods by the appraisers. 2d. That the board of appeals who appraised the goods was not legally constituted. 3d. That additional charges unauthorized by law, have been made by the appraisers.

To sustain the first ground, reference has been made to the case of Greely v. Thompson, 10 How. [51 U. S.] 225. There is no doubt the goods should have been examined. The oath of the appraisers imposes on them the duty of examination. But no form is prescribed, nor is it requisite that every article should be examined; a fair selection of samples or specimens is sufficient. 3 Stat. 735. In the case cited by counsel for the defendant (10 How. [51 U. S.] 225), the record shows that one of the appraisers never examined nor inspected the merchandise appraised, and the other never saw any portion of it. In the case at bar, in their report the appraisers state expressly, that they had examined the goods. In the absence of any counter-testimony, the official action of the appraisers must be taken as evidence of the fact of examination.

The second ground is, that the appraisement of the board of appeals was void, because one of their number was not authorized to act. The objection is in these words: "The appraiser general, who sat as one of the appraisers at large, under the act of 1851, is appointed under a clause in the general appropriation bill of March, 1853 [10 Stat. 201]. His name, and style, and compensation are different. The appropriation of $6,000 made, if it could be considered as creating by implication the office, is only for a year, and has never been renewed."

The facts as developed by the evidence are, that by an act of congress of 3d March, 1851 [supra], it was enacted that four appraisers should be appointed, who should be employed in visiting such ports under the direction of the secretary of the treasury as may be deemed useful by him, for the security of the revenue, and at such ports to afford aid and assistance in the appraisement of merchandise; and wherever practicable, in cases of an appeal from the decisions of the United States appraisers, under the provisions of the seventeenth section of the tariff act of 30th August, 1842 [5 Stat. 548], the collector shall select one discreet merchant, who shall be appointed with one of the appraisers appointed by this act, and their decision shall be final as to the value of the goods appraised. The appraisers (four in number) were appointed under this act, and were generally known and designated "general appraisers," or "appraisers at large." On the 3d March, 1853 [supra], congress passed the following enactment, in the appropriation act of that year: "For the compensation of an additional ap-

praiser-general, to be appointed by the president, with the advice and consent of the senate, and to be employed on the Pacific coast, six thousand dollars." Subsequently, a commission was issued to Richard Roman, appointing him appraiser-general during the pleasure of the president for the time being, under the act of 3d March, 1853, to be employed on the Pacific coast. By virtue of this commission, Major Roman entered upon the duties prescribed by the act of 3d March, 1851, and has continued those duties down to the present time.

An appraiser is said to be "a quasi judge or legislative referee." Hoyt v. U. S., 10 How. [51 U. S.] 109. If such an office has been even colorably created, and the present incumbent has discharged de facto its duties, then any irregularity which does not not render the creation of the office void, cannot be availed of in this collateral proceeding. His acts as appraiser de facto, so far as the public or third parties are concerned in interest, are as valid as if they were the acts of an appraiser de jure. People v. Stevens, 5 Hill, 617; People v. Covert, 1 Hill, 674; McInstry v. Tanner, 9 Johns. 135. One of the judges of this court, in view of the acts of congress, the commission issued to Major Roman under them, and his acting as appraiser de facto, came to the conclusion that it was unnecessary to go into a minute examination of the creation of the office, and the party having acted as appraiser de facto, the validity of his acts could not be assailed in this collateral proceeding. But as his associate deemed it proper that the creation or not of the office should be discussed and decided, and as both judges concur in the same conclusion, after such examination, it is unnecessary to place the decision of the case on the ground above stated. I proceed, then, to that examination.

It is contended, that no such office as the one claimed by defendant to exist, has been created in fact; that the incumbent is not authorized to act under the act of 3d March, 1851, under which he has assumed to act; that his style and compensation are different from those appraisers who were appointed under that act; that if any office was created, the incumbent was not authorized to discharge the duties prescribed by that act; and, lastly, the appropriation for his compensation being temporary, his office would, by the terms of the act of 3d March, 1853, expire with the current fiscal year, necessarily with the appropriation.

The question, then, is, was an office, and what office, created by the act of 3d March, 1853? It is a familiar rule in the construction of statutes, that where there are several acts of the legislature in pari materia, they are to be construed together when a construction is to be placed upon one of them the language of which is obscure, with a view to ascertain the intention of the legislature in passing the one under consideration. In this case, therefore, the court must look to other legislation of congress on the same subject, when it undertakes to interpret their language in the act of 3d March, 1853. It is true, the officer whose acts are now assailed, was named and commissioned by the official delegation, "appraiser-general," whereas the four officials appointed under the act of 3d March, 1851, are called in the act "appraisers." But they are generally known as, and called, "general appraisers," or "appraisers at large," and are designated so in the brief of the plaintiff's attorney. They have been, doubtless, so called to distinguish them from the local appraisers appointed under other acts of congress, and because their duties under the act of congress under which they were appointed, were of a general character, and did not limit them to one locality in the appraisement of merchandise. Congress themselves have recognized this distinction; for by the 5th section of the act of June 14, 1858 [11 Stat. 337], entitled "An act making appropriations for the expenses of collecting the revenue," when reducing the salaries of officers, it mentions the "general appraiser" (meaning the one whose duties are of a general nature), and the "appraiser" (meaning the local one confined to a particular place or occasion). That the act of 3d March, 1853, designated the person to be appointed "appraiser-general," and the appropriation for this compensation would, if not renewed, expire with the fiscal year 1853, are admitted facts. The influence they should exert in the construction of the act, will be hereafter considered. When this latter act was passed, there were in existence a certain number of appraisers known as "general appraisers," appointed under act of congress approved 3d March, 1851, with duties defined of a general nature, which characterized them and caused them to be designated as appraisers at large, or as general appraisers, to distinguish them from local appraisers, appointed under other acts of congress, or special appraisers; merchants, whom the collector was authorized by existing laws to appoint pro hac vice. On the 3d March, 1853, congress, desirous to increase the number of these appraisers, and provide for the wants of the revenue laws on the Pacific coast, enacted that an additional appraiser-general should be appointed. It is a rule of construction in the interpretation of statutes, that no word which is significant is to be repudiated, but to such word its full and appropriate meaning is to be given, and the whole of the language must be so construed "ut magis valeat quam pereat." This rule would be violated should this court strike the word "additional" from the statute, and fail to give it a meaning. Such violation would be gross in this case, where its repudiation would attribute to the legislature an apparent absurdity. Whereas, by giving it an appropriate meaning, and reasonable application, the act of congress can be

made intelligible by the application to it of the maxim, "Id certum est quod certum reddi potest."

It is urged, and strongly relied on, as a circumstance which disaffirms the idea that any office was created, that no duties were defined by the act of 3d March, 1853, under which the appointment of Major Roman was made. This court will not lightly impute to congress an absurdity. The fact that they have directed the appointment of an appraiser, and appropriated $6,000 for his compensation, confirms the conclusion to which the court is arrived. That the appointee had some work to do, is indicated by the language of the act, for by its terms "he is to be employed on the Pacific coast." Congress evidently intended to impose some duties upon him. It is reasonable to consider they were acting from some intelligent impulse, for some practicable purpose; and a fair interpretation and reasonable application of the language of the act show what their purpose was. They were aware, there were at that time in existence, under the act of 3d March, 1851, a certain number of appraisers, discharging the duties prescribed in that act, known generally as general appraisers. When, therefore, they deemed it expedient to add to their number, they considered it sufficient to direct the appointment of an "additional appraiser." Additional to whom? Certainly to the four appraisers already in existence, with duties defined. The only difference being, that the sphere of the duties of the additional one should be on the Pacific coast. To what other body of appraisers could he be added? There was no other of the kind known under existing laws. Shall the position of the word "general" after that of "appraiser," annul the appointment in face of the plain intention of the legislature indicated by a reasonable construction of their language; and this, by disregarding the meaning, import, and application of one of the most significant words of the act? That fact simply distinguishes him from the local appraisers, and characterizes the general nature of his duties. The second ground taken by plaintiff's counsel cannot be sustained.

The third proposition is, that the appraisers have added charges unauthorized by law. There is only one item obnoxious to this objection. After fixing the market or wholesale value of the goods, in the manner prescribed by law, the appraisers have added £43. 15s. charged as "transportation to Liverpool and shipping charges;" and the question is, "whether this item constitutes a dutiable charge, which can be added to the market price." No distinction has been made between the "costs of transportation" and "shipping charges." No means, therefore, are afforded to the court to separate the two, and they must be treated, as they have been by the appraisers, as a unit. Commenting on the act of 3d March, 1851, under which the duties in this case were laid,

the supreme court say, it "embraces all importations of goods that are subject to an ad valorem duty, and directs that the value, or wholesale price, shall be ascertained by the wholesale price at the period of exportation to the United States, in the principal markets in the country from which they are imported." The time and place are distinctly stated, to which the appraisers are to look. Stairs v. Peaslee, 18 How. [59 U. S.] 525. Prior to the passing of this law, former acts of congress had made the country of production or manufacture the place to which the appraisers were to look; but the act of 1851 will admit of but one construction, and that is, that the appraisement must be made by the value of the goods in the principal markets of the country from which the goods are imported, at the time of the exportation of them to the United States. Id. 526. "What markets within that country," (say the supreme court), "were the principal ones at the time of exportation, for an article of this description, was a question of fact, not of law, and to be decided by the appraisers, not the court. . . . And as the appraisers are by law the tribunal appointed to determine this question, their decision is conclusive upon the importer as well as the government." Id. 527.

In the case at bar, the appraisers have fixed the value of the goods in the manner prescribed by the act of 1851, and added to that value the item objected to. The latter clause of that act directs "that to such value or prices shall be added all costs and charges except insurance, and including commissions, &c.," and concludes by declaring "that the aggregate amount shall be deemed the true value at the port where the goods may be entered, upon which duties shall be levied." This language is similar to that used in pre-existing tariff-laws; but it will be found on examination of the tariff-act of 3d March, 1851, it differs essentially in other respects from these laws, and calls for a different construction. The interpretation placed upon the laws regulating the collection of duties, has induced the heads of the treasury department to authorize an addition to the value of the goods appraised,— their costs of transportation from the interior of the country to the place of exportation from it. In 1846, a distinguished gentleman then at the head of the treasury department issued circulars, giving his construction of the then existing tariff laws. The collectors were instructed to include in the "costs and charges," and add to the appraised value "the transhipment, with all the expenses included, from the place of growth, production, or manufacture, whether by land or water carriage, to the vessel in which shipment is made to the United States." The able view of the author of that circular, in favor of his construction of the then existing tariff-laws, has induced his official successors to adopt that construction.

It is more than doubtful, if the learned secretary could have had before him in 1846 the subsequent act of 3d March, 1851, that he would have placed upon it a similar construction. It is now the duty of this court to construe it. However great its respect for the views of the heads of the treasury department, it cannot substitute their opinions for what it believes the law to be. "Though as between the custom-house officers and the department, the latter must by law control the course of proceeding, yet, as between them and the importer, it is well settled, that the legality of all their doings may be revised in the judicial tribunals." Greely v. Thompson, 10 How. [51 U. S.] 234. Whether the construction placed by the treasury department on laws existing in 1846, and followed by that department since, is correct, is not a question before us. The single inquiry is, whether a fair interpretation of the act of 3d March, 1851, authorizes the appraisers to add to the market price assessed under that act, the costs of transportation of an article from the place of growth, manufacture, or purchase, in the interior of a country, to the place on the sea-coast whence it is exported? This cost may have been incurred long before the period of exportation. Can such be added to and included in the charges incidental to the shipment of the goods occurring at the "period of exportation," or as it is expressed by the supreme court in the case above cited, at the time of exportation? When, in 1851, congress passed the act under consideration, they intended, and did actually change the manner in which merchandise was to be appraised. Formerly, the appraisers were to look generally to the country of manufacture or growth. By the act of 3d March, 1851, a totally different mode was prescribed, and time and place were distinctly stated. After referring to the provisions of this act, the supreme court say, in Stairs v. Peaslee, 18 How. [59 U. S.] 526, "And so far as these provisions are inconsistent with previous laws, they show that congress had changed its policy in this respect, and intended to repeal the laws by which it had been established." The policy indicated by this last act, is to make the value of the goods what it was in the principal markets of the country at the time of the exportation of them. Congress considered that ordinarily, all costs and expenses which had been incurred by placing the goods at a place of exportation, would, by a natural law of trade, enter into the wholesale price of the same kind of goods, in the principal markets of the country; and to get that value, they designated the last moment, the time of exportation. This court does not intend to decide, that charges incurred at the period of exportation, or about that time, incidental to the shipment of the goods, such as port-charges, drayage, &c., may not be added. This question is not directly before the court; but it

is united in the conclusion, that charges for the transportation of goods from the interior of the country, by railroad or water-carriage, incurred prior to the time of exportation, cannot be added to the value of goods to be ascertained in the mode prescribed by the act of 3d March, 1851.

Since coming to this conclusion, there has been brought to the notice of this court, a case reported in one of the gazettes of Boston, involving the point under consideration. It has not been authoritatively enunciated; but as far as it is entitled to credence, it is parallel with this case. As reported, it is entitled Forman v. Peaslee [Case No. 4,941]. It appeared, that plaintiff entered into a contract with T. & Co., for the transportation of iron from Wales to the United States; in pursuance of which, T. & Co. employed coasting vessels to bring it from Wales to Liverpool, whence it was transhipped on board their packets for Boston. The court held, "the period of exportation," at which the market value was to be ascertained under the act of 3d March, 1851, was the time when the goods left Liverpool for the United States; that the cost of transportation from Wales to Liverpool is not a dutiable charge, which can be added to the market price. The only difference between that case and the one at bar is, that in the one, the interior transportation was along the coast by water, in the latter, it was by land-carriage from the interior to Liverpool. It is difficult to perceive, how the mode of transportation can alter the application of the principle as to its cost. The secretary of the treasury distinguished no difference when in his circular in 1846, he directed "that the costs of transportation from the interior to the place of exportation should be added, whether by land or water."

Another objection urged by plaintiff's counsel is, that the costs and charges in this case were made by the appraisers, and not by the collector. The act of congress requires in general terms they should be added; but does not state by whom. Now, if added by the appraisers, under the authority and approval of the collector, it is a sufficient compliance with the law. But it is unnecessary to decide this question, as we place the disallowal of the charges on the ground that the costs of interior transportation which accrued previously to the period of transportation, are not dutiable under the existing act.

The next proposition relied upon by plaintiff is, that the appropriation for compensation of the incumbent of the new office was temporary, and for the fiscal year 1853; and that the tenure of the office expired with the appropriation. If the office was, as this court has decided, created, it has not been vacated even if it be admitted that the appropriation was not renewed; though it must be admitted that most aspirants look to salary as the most important part of the

office. But the tenure of office depends upon the nature, character, and extent of its duties, upon the language of the act which creates it, and the terms of the commission held under it. The act, in this case, directed the appointment to be made by the president, with the advice and consent of the senate; and the law annexed to it by implication a like term with those held by similar officers. The commission prescribed the tenure of the office to be during the pleasure of the president for the time being. The act directed the appointment of an additional appraiser general, and the use of the word "general" clearly indicates the general nature of his duties. When he was appointed as additional appraiser, he became one of the body already created, and stands on an equal footing with them as to tenure of office. There is a class of cases in which a temporary appointment might be inferred, on the ground that a temporary compensation had been made; and that inference would be aided by the nature and character of the duties to be discharged. When, for instance, a special mission was created to accomplish a particular object, which, from its nature, it was reasonably to be supposed was to be accomplished forthwith, or not at all; the fact that a specific sum was appropriated with the character of the service, might indicate that the office was to expire with the appropriation. The principle of such a class of cases is not applicable to the case at bar.

The only ground taken by the plaintiff in this case, which the court can sustain, is the objection made to the item of additional charges. A judgment, therefore, will be entered for the plaintiff for the amount of the rejected item, and submitted to the court for its inspection and approval.

GIBBES, The J. C. See Case No. 7,248.

GIBBONEY (CLARK v.). See Case No. 2,- 821.

GIBBONEY (DORR v.). See Case No. 4,006.

GIBBONEY (KAIN v.). See Case No. 7,595.

GIBBONEY (PRESTON v.). See Case No. 11,396.