ROESSLER & HASSLACHER CHEMICAL CO. *v.* UNITED STATES
(No. 150).[1]

DUTIABLE VALUE ON DATE OF EXPORTATION.

A shipment of goods from one point to another within a country for transshipment beyond that country is not, then, a true exportation, and such a shipment becomes a true exportation only and takes its valuation as of the date the vessel with these goods on board is cleared for the United States.—Almy *v.* State of California (24 How., 169) distinguished.

### United States Court of Customs Appeals, February 27, 1911.

TRANSFERRED from United States Circuit Court for Southern District of New York
Abstract 21579 (T. D. 29906).

[Affirmed.]

*Brooks & Brooks* (*Frederick W. Brooks*, of counsel) for appellants.

*D. Frank Lloyd*, Assistant Attorney General (*Charles E. McNabb* on the brief), for the United States.

Before MONTGOMERY, HUNT, SMITH, BARBER, and DE VRIES, Judges.

MONTGOMERY, Presiding Judge, delivered the opinion of the court:

Certain bromides were imported under a bill of lading dated at Hamburg, April 7, 1906.   Based upon the bill of lading, a pro forma invoice for the goods, dated April 7, 1906, at a valuation of 100 marks per 100 kilos, was given by the importers.   The appraiser passed the invoice by adding 50 marks per 100 kilos to the invoice price, it appearing that the market price for such goods had been advanced April 5, 1906, from 100 marks to 150 marks per 100 kilos.

The importers obtaining later information that the goods were in fact shipped from Berlin or from the factory on the 31st of March,

---

[1] Reported in T. D. 31353 (20 Treas. Dec., 408).

1906, they sent for a corrected invoice containing that date of shipment and stating the price of goods at 100 marks per 100 kilos.   The collector assessed the duty on the valuation found by the appraiser, protest was filed and an appeal taken to the Board of General Appraisers, and their decision affirming the action of the collector is brought before us for review.

The importers claim that the invoice price was fixed at the figure of 100 marks per 100 kilos because of the clerical error in stating the date of the exportation.   Reliance is placed on section 2904 of the United States Revised Statutes, which provides:

When the duty upon any imports shall be subject to be levied upon the true market value of such imports in the principal markets of the country from whence the importation has been made, or at the port of exportation, the duty shall be estimated and collected upon the value on the day of actual shipment, whenever a bill of lading shall be presented showing the date of shipment, and which shall be certified by a certificate of the United States consul, commercial agent, or other legally authorized deputy.

It is claimed that under this section the goods are deemed to be shipped when they are committed to a railroad company to be transported to the port and there reshipped to the United States.   This section was enacted March 2, 1861.   To ascertain the intent of the enactment, reference should be had to the state of the law existing at that time.   In Sampson *v.* Peaslee (20 How., 571) and in Irvine *v.* Redfield (22 How., 170) it had been determined that the date of exportation was the date of the sailing of the vessel, and that even though goods were placed in the custody of the carrier and a bill of lading actually given no exportation could be said to have occurred until the actual sailing of the vessel.   This being so, the section above quoted was enacted, and it would seem that the purpose of the enactment was to so far modify this ruling as to substitute for evidence of the date of the actual sailing of the vessel a bill of lading showing the date of shipment and containing a certificate of the United States consul, commercial agent, or deputy.   It may be said that no such certified bill of lading has been produced.   The evidence of the contents of the bills of lading given at Berlin is in the record, but it does not appear that they were bills of lading certified by the consular agent as required by this section of the statute.

However, we do not determine the case upon this technical omission, as we think it clear that this section must be read in connection with sections 10 and 19 of the customs administrative act of June 10, 1890, the former of which requires that the appraiser shall ascertain—

the actual market value and wholesale price of the merchandise at the time of exportation to the United States in the principal markets of the country whence the same has been imported.

Section 19 requires that duties shall be—

assessed upon the actual market value or wholesale price of such merchandise, as bought and sold in usual wholesale quantities, at the time of exportation to the United States, in the .principal markets of the country from whence imported, and in the condition in which such merchandise is there bought and sold 'for exportation to the United States.

These sections make it clear that the date of exportation to the United States is the date as to which the valuation shall be fixed. The valuation is to be based upon the principal markets of the country whence imported, but it shall be as of the date of exportation. It is then important to inquire what constitutes an exportation to the United States from a foreign country. This question is not new, but has been before the courts in numerous cases. The case of Forman v. Peaslee (9 Fed. Cas., 452), decided in 1857, is in point. In that case the court construed the statute requiring the appraisers to ascertain the market value of the imports at the period of exportation to the United States. The goods had been shipped from Wales, in Great Britain, to Liverpool, and there reshipped to the United States. It was held that the transportation of the goods coastwise from one British port to another was not an exportation from Great Britain; that until the vessels having on board the goods were cleared from Liverpool there was no complete act of exportation. Until that time the property was held to be under the control of the English Government, whose order could have arrested and detained it within that country, and whose control over it would have been unaffected by the fact that it had been brought from Cardiff and Newport for the purpose of being sent to the United States.

The same question has arisen in several cases where the goods had been shipped by land carriage from the interior of Great Britain to the port of exportation. Gibb v. Washington (10 Fed. Cas., 288); Hutton v. Schell (12 Fed. Cas., 1095).

In Gibb v. Washington, the court, referring to Forman v. Peaslee, said:

The only difference between that case and the one at bar is, that in the one, the interior transportation was along the coast by water, in the latter, it was by land carriage from the interior to Liverpool. It is difficult to perceive how the mode of transportation can alter the application of the principle as to its cost.

That case would seem to be directly in point with the case under consideration.

It is claimed that a different meaning has been given to the word "export" by the Supreme Court in the case of Almy v. State of California (24 How., 169). We think the case is clearly distinguishable. The court there had under consideration the question of the constitutionality of a law of California imposing a stamp tax upon bills of lading. The law imposed a tax on bills of lading for the transporta-

tion from any point or place within the State to any point or place without the State of gold or silver coin, and requiring that there should be attached to the bill of lading, or stamped thereon, a stamp or stamps, expressing in value the amount of such tax or duty. The court construed the terms of the Constitution which declares that—

no State shall without the consent of Congress lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws.

The court in its discussion said:

And if the law of California is constitutional, then every cargo of every description exported from the United States may be made to pay an export duty to the State, provided the tax is imposed in the form of a tax on the bill of lading, and this in direct opposition to the plain and express prohibition in the Constitution of the United States.

We think the case does not make for the doctrine that a shipment from one shipping point within a territory or country to another for the purpose of transshipment beyond the realm constitutes an exportation. This would be opposed to the authorities which we have cited above, and to the common acceptation of the term as employed in the revenue laws for many years.

No error was committed to the prejudice of the importer, and the decision will be *affirmed*.