(A. R. D. 18)

D. N. & E. WALTER & CO. (HOYT, SHEPSTON & SCIARONI)
*v.* UNITED STATES

Entry Nos. WH 1603; CE 3186; CE 3187.

First Division, Appellate Term

(Decided March 5, 1953)

*Lawrence, Tuttle & Harper* (*Frank L. Lawrence, Charles J. Evans,* and *George R. Tuttle* of counsel) for the appellant.

*Charles J. Wagner,* Acting Assistant Attorney General (*Daniel I. Auster,* special attorney), for the appellee.

Before OLIVER and MOLLISON, Judges; MOLLISON, J., concurring

OLIVER, Chief Judge: This case is before us as a review of the decision and judgment by Judge Ekwall, *D. N. & E. Walter & Co.* (*Hoyt, Shepston & Sciaroni*) v. *United States,* 25 Cust. Ct. 398, Reap. Dec. 7867, sustaining the appraised values of three shipments of rugs exported from China and entered at the port of San Francisco.

In the case of reappraisement 163450–A, appellant (importer) purchased the rugs in China in March 1941. They were shipped from Tientsin, China, in July 1941, and reached Kobe, Japan, where they were to have been transshipped to the United States. Due to war conditions, shipment to the United States could not be made at that time. The sailing of the vessel which was to carry the rugs was canceled, and no other vessels of the shipping line were scheduled to depart from Kobe for the United States. The rugs were thereupon returned to the seller who stored them in their original packages until 1946, at which time they were shipped to the United States. Although exportation of the merchandise was made in 1946, appellant paid for them in 1941.

In the case of reappraisements 163451–A and 163452–A, the rugs were purchased in Tientsin, China, in May 1941, and in October of the same year, the merchandise was sent to Shanghai, China, for transshipment to the United States. Due to governmental control under existing war conditions, the rugs were held at Shanghai until 1946, when shipment to the United States was completed. Copies of the seller's invoices reached appellant in 1944, at which time it became known that the rugs were safe after the outbreak of war. Payment for the merchandise was not made until 1946, when appellant (im-

porter) included in the amount the cost of warehousing, plus 5 per centum interest on the purchase price for the period during which the rugs had been held.

On the foregoing undisputed facts, the question presented is whether the merchandise was exported in 1941, as claimed by appellant, or in 1946, the time adopted by the appraiser. Counsel for the respective parties have agreed that if the time of exportation is 1941, then the importer's entered values are correct, but if the time of exportation is 1946, then the appraised values are correct. The legal phase of the case requires a judicial interpretation of the statutory phrase, "at the time of exportation," as such words appear in the definition of export value set forth in section 402 (d) of the Tariff Act of 1930, which is concededly the proper basis for appraisement of the merchandise in question.

Export value is defined in section 402 (d), *supra*, as follows:

EXPORT VALUE.—The export value of imported merchandise shall be the market value or the price, *at the time of exportation* of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States. [Italics added.]

The trial judge held that the issue is controlled by the long-established rule that the time of exportation for purposes of value under the tariff act is the date of the last sailing of the importing vessel from the country from whence exported, and cited *Sampson et al.* v. *Peaslee*, 61 U. S. 571; *Irvine et al.* v. *Redfield*, 64 U. S. 170; *China & Japan Trading Co., Ltd.* v. *United States*, T. D. 20954, G. A. 4400; *Roessler & Hasslacher Chemical Co.* v. *United States*, 1 Ct. Cust. Appls. 290, T. D. 31353; and *United States* v. *Abell Forwarding Co., Inc.*, 73 Treas. Dec. 1426, Reap. Dec. 4248.

Counsel for appellant, in their brief, concede that the cited cases "support the rule that the date of exportation is the date of the last sailing of the vessel from the country of exportation," but contend that the rule relates to direct shipments from the exporting country to the United States, and cannot be applied to "interrupted transit of merchandise." The argument is in contradiction of the conclusion reached in the *Roessler & Hasslacher Chemical Co.* case, *supra*, which held, in effect, that shipment of goods from one shipping point to another within a country for transshipment beyond that country is not a true exportation.

None of the cases upon which appellant relies can be favorably applied to change or reverse the conclusion reached by the trial court. A brief review of each case cited by appellant follows.

In *United States* v. *Y. Papazion*, Reap. Circ. 36357, pearls purchased in Bombay, India, were sent to an intermediary in Antwerp, Belgium, and then shipped to the United States. The conclusion, holding the shipment to be an exportation from Bombay, India, was based on a finding that there was no market for pearls in Antwerp, Belgium, and that the value therefor should be based on "the market value in Bombay, the pearl market of the world," and a principal market for the merchandise. The case offers no support to appellant's position.

In the case of *United States* v. *Meadows, Wye & Co. (Inc.)*, 49 Treas. Dec. 959, T. D. 41622, the principal question concerned the right of a party to dispute the correctness of statements in an invoice. The record therein was conclusive in showing that Italy was the place of manufacture and shipment. Rebilling and repacking the merchandise at London, without entering the commerce of England, did not change the country of exportation, which was Italy from the very outset. The time of exportation from the exporting country, which is the issue herein, was not a consideration in the said case.

Cases in which the carrying vessel met with an accident causing the merchandise to be transferred to another ship that brought the goods to the United States are distinguishable. Reap. Circ. 1145, affirmed on rehearing in Reap. Circ. 1346; and Reap. Circ. 27894. Under the circumstances arising in each of those cases, there was merely an interruption in the voyages of exportation to the United States. The facts disclosed in each of those instances are not comparable to what has been established in this case. Here, there was an abortive shipment in 1941, caused by war conditions that utterly disrupted or destroyed commerce between the country of exportation and the United States over the period from 1941 to 1946. Under such unusual circumstances, the merchandise in question had to be held in the country of exportation for a period of 5 years, the effect thereof being a virtual nullification of the action in 1941. The case reported in Reap. Circ. 30229, discussed by the trial judge, is in point. There, as here, the shipment had started, but because of war conditions, the merchandise was held in the country of exportation for a period of years. The importer claimed, as appellant does in this case, that the earlier date constituted the time of exportation for purposes of valuation. The contention was overruled and the court adhered to the established rule that the time of exportation is the date of sailing of the vessel upon which the goods were transported to the United States.

For all of the reasons hereinabove set forth, we find as matter of fact:

(1) That the rugs in question left Tientsin, China, in 1941.

(2) That the merchandise covered by reappraisement 163450–A reached Kobe, Japan, but due to war conditions which disrupted

sailing schedules, thereby preventing further shipment to the United States, the rugs in that case were returned to the seller until 1946, at which time they were shipped to the United States.

(3) That the merchandise covered by reappraisements 163451–A and 163452–A was sent to Shanghai, China, in May 1941, where it remained until 1946, at which time the shipment to the United States was completed.

Accordingly, we hold as matter of law:

(1) That "the time of exportation," within the meaning of those words as used in the statutory definition of export value, section 402 (d) of the Tariff Act of 1930, concededly the proper basis for appraisement of the rugs in question, was 1946, or the date of the last sailing of the importing vessel from the country of exportation.

(2) That such export values for the present merchandise are the appraised values.

The judgment of the trial court is affirmed, and judgment will be rendered accordingly.

### CONCURRING OPINION

Mollison, Judge:   I concur in the decision written by my colleague, Chief Judge Oliver, in these cases.   So far as the merchandise the subject of reappraisements 163451–A and 163452–A is concerned, it clearly appears that the rugs there involved never physically left China until 1946.   Plaintiff-appellant's attorneys contend that the intention to export, coupled with the physical act of transporting the goods from one port in China to another, was sufficient to consider them as having been exported in 1941, without actual carriage out of China at that time.

Appellant has not cited, nor have we been able to find, any case which holds that any act short of physically transporting goods out of a country can be considered to be an act of exportation.   The common meaning of the verb "to export" and of its derivatives is to carry or send abroad, and both this meaning and the decided cases, as cited by Chief Judge Oliver, are against the contention made on behalf of the appellant.   Cf., also, the decisions in the cases of *B. Solomon* v. *United States*, 26 Cust. Ct. 403, Abstract 55453, and *United States* v. *The National Sugar Refining Co.*, 39 C. C. P. A. (Customs) 96, C. A. D. 470, which, while relating to the subject of exportation from the United States for benefit of drawback, enunciate principles which seem applicable as well to the subject of exportation generally.

With reference to the rugs the subject of reappraisement 163450–A, which left China in 1941, reached Kobe, Japan, were held up there, and were ultimately returned to China in 1942, it would appear that

there was a *bona fide* exportation in 1941, but that that exportation was nullified or canceled by the return and importation of the goods into China in 1942. The act of importation has been said to be the converse of the act of exportation (*Flagler* v. *Kidd et al.*, 78 Fed. 341), and it would appear that the importation back into China of goods previously exported nullified whatever status the goods may have acquired by reason of the exportation.

It is urged by counsel for the appellant in the brief filed in its behalf that on the return to China the goods "did not enter into the commerce of China" and that the situation should be treated as one of interruption of transit of the goods on their journey to the United States. There is in evidence as part of plaintiff's collective exhibit 1 certificates of import issued by the Commissioner of Customs at Tientsin, China, that the merchandise involved "was imported into China * * * and that the duties imposed bg [*sic*] the laws in force in China upon the said merchandise have been paid." This evidence, offered by the plaintiff, would seem to establish that the importation into China was a completed act. There does not appear to have been imposed upon the importation any condition that the rugs be withheld from the commerce of China, and it would seem that the act of the purchasers' agents in keeping them out of the Chinese market was entirely voluntary and did not affect the completeness of the importation. Apparently, complete control of the merchandise, while in China, was in their hands, so that it is questionable whether it is correct to say that the goods did not enter into the commerce of that country.

So far as the law applicable to our own country is concerned, generally speaking, entry of goods into the commerce of this country occurs when the importer or owner receives unconditional control of the goods. See *United States* v. *Mussman & Shafer, Inc.*, 40 C. C. P. A. (Customs) 108, C. A. D. 506, decided January 14, 1953.